# IN RE MATTULLATH.

PATENTS; APPEAL AND ERROR; ABANDONED APPLICATION; REVIVAL; JUDICIAL DISCRETION.

1. The right of appeal from a final decision of the Commissioner of Patents is determinable by its substance and effect rather than its form. (Following *Moore* v. *Heany*, 34 App. D. C. 31, and *Re Selden*, 36 App. D. C. 428.)

2. An order of the Commissioner of Patents denying a petition for a rehearing, after a petition to revive an application for a patent has been denied, is appealable to this court, where, owing to the long lapse of time between the original application and the application to revive, a new application would be practically unavailing, and the order is therefore equivalent to a complete rejection of the claim of the original application. (Following *Re Selden*, supra.)

3. While, ordinarily, the exercise of discretion in matters arising in the course of litigation will not be disturbed unless it has been abused, nevertheless, it is subject to review along with other rulings affecting the rights of the parties, and will be disturbed where the error in its exercise is plainly shown, and works material hardship and injustice. (Citing *Kinsman* v. *Strohm*, 31 App. D. C. 581.)

4. Whether the delay of a party who seeks to revive an abandoned application for a patent was unavoidable, within the meaning of sec. 4894, Rev. Stat., U. S. Comp. Stat. 1901, p. 3384, is not for the

Vol. XXXVIII.—32.

exclusive determination of the Commissioner of Patents, but the applicant has a right to appeal from his decision to this court; especially where the question of abandonment is one of law, and not of fact. (Citing *Kinsman* v. *Strohm*, supra, and following *Re Selden*, 36 App. D. C. 435.)

5. Where six years have elapsed between the last action of the Patent Office upon an application for a patent and the filing of an application to revive, a conclusive presumption against the existence of an acceptable excuse for the delay is not necessarily created by the fact that others have, in the meantime, entered the field and obtained patents, and are reaping the rewards of their efforts; but the question upon which the right of revival depends is whether the party seeking to revive has slept upon his rights.

6. The purpose and policy of the patent law are to give the patent to the first inventor, unless he has by his own fault subordinated his right to a more diligent inventor.

7. The power to allow formal amendments to claims of an application for patent, containing no amplification of the original application, and requiring no additional oath, remains in the Patent Office, notwithstanding the death of the applicant.

8. Notice by the Patent Office to the solicitors of record of an applicant for a patent, of the rejection of claims, and suggesting amendments, is not equivalent to notice to the legal representatives of the applicant, so as to impute their knowledge to him; especially where the Patent Office has notified the solicitors that the death of the applicant has revoked their power of attorney from him.

9. While rule 20 of the Patent Office, construed literally, does not seem to require notice by the Patent Office to the legal representatives of an applicant, of the revocation of the power of attorney of the solicitors of record of the applicant, it would seem that a construction requiring such a notice would be within the spirit of the rule.

10. Ignorance by the widow of an applicant for a patent that she could obtain information concerning her husband's application by applying to the Patent Office; and also that there is an essential difference between a patent and an application for a patent, is ignorance of fact, and not of law.

11. A test of whether the delay of an applicant to seek to revive a patent application, or his legal representatives, has been unavoidable within the meaning of sec. 4894, Rev. Stat., is whether he has used such care and diligence as a prudent and careful person would have used under the circumstances.

12. A decision of the Commissioner of Patents, refusing to permit the administratrix and widow of a deceased applicant for a patent for

a heavier-than-air flying machine, to revive the application. was *reversed*, and the application was ordered to be reinstated, where it appeared, among other things, that about six years elapsed between the last action taken by the Patent Office and the application to revive; that while the Office, in acting upon the claims of the application, and insisting that an actual demonstration of operativeness would be required before the grant of a patent, allowed certain claims and rejected others, suggesting amendments; that the last action of the Office was an indorsement on the application that an amendment made had been considered, but that no action could be taken because the applicant's death operated as a revocation of the power of attorney of the applicant's solicitors of record, and there was therefore no one of record authorized to prosecute the case; that this action was taken although there was nothing of record to show the death of the applicant; that no notice to the legal representatives of the applicant of such action was given by the Office; that the solicitors of record of the deceased applicant thereafter gave permission to a third party interested in flying machines, to inspect the application and drawings on file, which authorization was apparently recognized by the Patent Office; that the widow of the applicant, who was poor and dependent upon one of her children, acted with diligence and in good faith in attempting to ascertain what patent rights her husband had died possessed of, and exhausted all sources of information to do so; that she was stirred to renewed activity by the receipt of information received from the representative of a patentee of a flying machine who was engaged in an infringement suit, which information was probably obtained through access obtained to the application of her husband; that the first patent solicitor employed by the widow to file the application to revive failed to do so because of illness, from which he finally died; and that she was ignorant that she could have obtained information concerning her husband's application by applying to the Patent Office.

No. 751.    Patent Appeals.    Submitted March 13, 1912.    Decided April 1, 1912.

HEARING on an appeal from a decision of the Commissioner of Patents denying an application to revive an application for a patent.                                        *Reversed.*

The COURT in the opinion stated the facts as follows:

On January 8, 1900, Hugo Mattullath filed an application

for a patent for a flying machine. His home was then in the city of New York, where his family then, and has since, resided. At the time of filing the application he was in the city of Detroit, Michigan, and gave a power of attorney to Barthel & Barthel, patent solicitors having an office in that city, to represent him. The power of attorney was filed with the application, and the same was prosecuted by the solicitors in connection with their associate in the city of Washington. On March 10, 1900, objections were made by the Examiner, in which he pointed out many formal defects, suggesting changes, amendments, etc. In the body of this communication he said:

"The construction is regarded as inoperative for the purpose intended, and therefore not useful within the meaning of the patent law. No successful attempt has yet been made to rise from the earth's surface by means of an aerial vessel unprovided with a balloon. The results of previous experimentation indicate that, even if the rising could be successfully accomplished, the vessel would be uncontrollable through inability to maintain its normal position or balance. Minor difficulties lie in the apparent inadequacy of the propelling means acting against the air, to insure such speed, either in the air or in water, as is needed to give the æroplanes sufficient lifting power. Applicant has disclosed no new principle or construction which would on its face exempt his device from the difficulties by his predecessors in this line. However plausible applicant's theory may be, in view of the present state of the mechanic arts and the results of previous experimentation, the step is so long from the theory to actual use, and the practicability of his apparatus is so problematical, that actual demonstration of operativeness will be required before the grant of a patent."

The communication was responded to April 9, 1900, by the Washington solicitor in a communication proposing amendments, and arguing in favor of general patentability. A communication from the Examiner, dated May 16, 1900, objected to certain claims, allowing one, and suggesting amendments to others. In conclusion he added: "The former criticisms as to the showing, etc., are repeated." Other amendments were

offered during 1901 and 1902, and the Examiner, on October 1, 1902, sent a communication, rejecting claims 1 and 2 on references, suggesting amendments to claims 15 and 16, and that claims 21-22 and 23 appear to be allowable. In conclusion he said: "The rejection on the ground of inoperativeness and consequent lack of utility is adhered to." The correspondence took place between the Washington solicitor and the Examiner. September 18, 1903, the solicitor filed formal amendments in an attempt to comply with the last notice of objections. September 29, 1903, the Examiner made the following indorsement on the application for amendment, signing his name thereto officially: "This application as amended September 18, 1903, has been considered. An amendment has been received in this case, but no action can be taken upon the merits thereof, for the reason that the applicant's death operates as revocation of the power of attorney to Barthel & Barthel, and there is no one of record authorized to prosecute the case."

There is no suggestion of the death of the applicant in the record, and how knowledge thereof came to the Examiner is not shown. The transcript of the proceedings in the Office does not show the fact, but it appears from the affidavits filed in the prosecution renewal that a letter was addressed to Barthel & Barthel notifying them of the revocation of their power of attorney by the death of the applicant. It appears in the same way that Hugo Mattullath died in Washington December 30, 1902. It appears from the Office transcript that a letter was filed August 14, 1909, from the Washington solicitor, giving permission to Professor Zahm to inspect the application and drawings on file.

October 19, 1909, Meta Mattullath, who had received letters of administration upon the estate of her deceased husband, Hugo Mattullath, executed a power of attorney to one R. H. E. Starr, of New York, authorizing him to represent her in the Patent Office, which was filed and accepted November 5, 1909, and Starr was so notified November 6. September 16, 1910, she executed another power of attorney to Joseph F. O'Brien, which was filed in the Office. On November 22, 1910, O'Brien

filed a short amendment of the original application, canceling claims 1 and 2, and formally amending claims 15 and 16 by inserting the "of," as suggested in the before-mentioned communication of the Examiner dated October 1, 1902. The application was entered on the Office records as abandoned October 3, 1903. On November 23, 1910, Meta Mattullath filed a petition to revive. In this she alleged that her husband lived in New York, and died in Washington, December 30, 1902, leaving petitioner, his widow, and three daughters. That she had been duly appointed administratrix of his estate. That while she and other members of his family knew that intestate had worked on an invention of flying machines, none of them had knowledge of the existence of the said application until about October 13, 1909, when informed by an attorney in New York, who called to request her to sign an instrument authorizing him to have access to said file. Said authority was given to Mr. Newell, but subsequently she executed a power of attorney to R. H. E. Starr, revoking the former one, that intestate left no estate whatever, and petitioner was destitute, and being supported by her children. Mr. Starr consented to act for her without fee, if she could advance money for necessary disbursements. That she managed to pay him $41 for the purpose, and he agreed to make application to revive the application for patent. That petitioner believed that application had been made. She had since learned that no application was made by Mr. Starr on account of severe illness, which finally resulted in his death. Shortly before his death, she wrote to him to return her papers in case his illness was so serious that he could not prosecute the business promptly. Receiving word that he was unable to proceed, petitioner undertook to recover her papers, among them copies of Patent Office proceedings which Starr had obtained with the money advanced by her. That these papers were scattered and could not be obtained. Petitioner then undertook to procure the services of others, and among them considered Barthel & Barthel, but, learning that they had written to Mr. Starr wanting $100 per day, she did not communicate with them. After some delay she succeeded in se-

curing the services of Mr. O'Brien, who agreed to represent her without compensation. That she is informed that an amendment to the application was prepared by Barthel & Barthel, or their Washington associate, after the death of her husband, and that the same was refused on the ground that his death had revoked their authority. That she was never notified by said attorneys of said action; and had she been would certainly have ratified the act of said attorneys in filing the amendment, and have endeavored to prosecute the application. That neither she nor her children knew that her husband had an application pending, and in fact did not know that there was a difference between an application for a patent, and a patent. That they thought, from his efforts in the matter of airships, that her husband had some kind of a patent, but upon investigation found that such patents as he had had been assigned to other parties. This petition to revive the application was sworn to by the petitioner and supported by affidavits of each of the children of intestate, and a son-in-law. An affidavit by the confidential clerk of Mr. Starr, Rose V. Finn, corroborated petitioner as regards the employment of Mr. Starr, and gave the details of his sickness, of his attempt to attend to the revival of the application, of his being compelled to leave his office, and removal of some of his papers to his father's home, of the communications from petitioner regarding the business, and Mr. Starr's expression of the belief that he would soon be strong enough to prosecute the business. She also stated that when a suggestion was made to him to give the business up, his reply was that petitioner had no money to employ another attorney, and that he would soon be able to attend to it. A few days before his death, he realized his condition, and then notified petitioner and instructed that her papers be surrendered. Affiant searched for copy of the application and file wrapper, but was unable to find them. Mr. Starr died of tuberculosis and neuritis on September 8, 1910. The affidavit of Joseph F. O'Brien, the succeeding attorney, was to the effect that as soon as employed he began the search for papers supposed to have been in Starr's possession, and succeeded in obtaining a letter

of Wilbur F. Wright from Mr. Starr's father. The certified copy of the application and file wrapper could not be found, and he was compelled to obtain the same from the Patent Office, which he received about ten days or two weeks before filing the petition to revive. To this affidavit is attached the following letter from Wilbur F. Wright:

College Park, Maryland,
14 October, 1909.

Miss Alice Mattullath,
　　　　　　New York,
Dear Madam:—

I thank you for your very kind letter of 29th September, which I have found it impossible to answer hitherto. I had already arranged a canoe to float the machine in case of coming down, so could not try the raft you were so kind as to suggest and offer, but I very much appreciate the friendly spirit which prompted you.

I knew a little of your father's work through conversation with Professor Zahm and others, but he had died before my brother and I had really begun our work.

With many thanks and best respects,
　　　　　　Yours truly,
　　　　　　　　Wilbur Wright.

The following letter from Barthel & Barthel to Mr. Starr, was also attached:

Detroit, Mich., Nov. 20, 1909.

Mr. R. H. E. Starr,
　280 Broadway, New York, N. Y.
Dear Sir:——

In reply to your favor of November 13, re Mattullath, would say that we believe the same discloses at least some of the fundamental principles of the aeroplane.

In reference to the various points covered in your letter would say, first, when we received the Patent Office letter notifying us that the death of the applicant had operated as a

revocation of our power, we believe that we notified no one, as we did not know the address or whereabouts of the widow. Second, as far as we know there was no agreement in existence between the applicant and other parties, unless it might possibly have been parties in Pittsburg or Prof. Langley or Zahm, with whom he had consulted considerably while in Washington. Third, we have no copy of any agreement or other document which could show any interest in any outside party.

We could verify the above points fully upon making a proper search through our office records.

It is our recollection that at the time of Mr. Mattullath's death he was in or near Washington, and we had given him the address of our Washington associate, and that at the time of his leaving here he gave us no address where we could reach him.

We received a notice from the Patent Office revoking our power of attorney, and do not believe that the family knew anything of the existence of this application, as Mr. Mattullath was very secretive in connection with work on this invention. Our charges as attorneys would be $100 per day and expenses. * * * Mr. Mattullath was a frequent caller upon us during the preparation of this application, and might state that he spent weeks at a time in and about our office in connection with this matter. * * *

(Signed) Barthel & Barthel.

The petition came before Assistant Commissioner Tennant, who denied it in a decision entered March 25, 1911. The grounds of his decision are fairly represented in the following extract from his opinion:

"It is urged in support of the petition that the delay in amending this application within the period allowed by law was unavoidable, for the reason that the administratrix was wholly unaware of the pendency of the application until October 13, 1909, and that thereafter she did all within her power and financial means to obtain the revival of this application and resumption of its prosecution. It is urged that the ground of inoperativeness or lack of utility which was the basis of the

objection was removed at the time it was first demonstrated that aeroplanes could be successfully flown and managed in flight, and it is insisted that the Mattullath machine embodies the same principles as those machines which are in successful flight at the present time.

"Although the path of the administratrix of the estate of Hugo Mattullath, as appears from the affidavits, has, since October, 1909, been strewn with obstacles, I am clearly of the opinion that the showing is insufficient to establish unavoidable delay for the entire period since October, 1903, in the circumstances attending this case. The application was filed in the early part of 1900, and a patent was refused upon the ground that no heavier-than-air machines of this character had ever been successfully flown, and that therefore the invention lacked utility. There is no showing in the record that any attempt was ever made by this applicant to overcome this ground of rejection, although the case was pending over two years before the death of the applicant. It appears from the affidavit of the administratrix, Mrs. Mattullath, that as early a date as her marriage with Hugo Mattullath, which occurred in the year 1868, she was aware that her husband was studying aeronautics and intended to build a flying machine."

(It is to be observed that while this required demonstration of operativeness was insisted upon, the Office had been, commendably, permitting and aiding in the formal perfection of the claims, preliminary to the final demonstration of utility, which formal perfection had not been completed and was attempted in the last amendment filed September 18, 1903.)

Petitioner renewed her petition for hearing before the Commissioner. It is in the nature of an application for a rehearing. In support of this petition she filed an elaborate affidavit stating particularly her efforts to obtain information. She said that her husband left Detroit on May 10, 1900, for Washington, and only occasionally visited New York city. Unable to learn anything about his interests, she consulted Kaufman Simon, an attorney and friend, who advised her to communicate with all parties known to have been closely associated with

her husband, who might know anything of his affairs. Accordingly, in January, 1903, she wrote to Charles H. McKee and Frank Moore of Pittsburg, and Professor Zahm and Mr. Brown, of Washington, who were believed to know something of her husband's work, inquiring if he had left any patents or anything in any shape or form of value. No reply was received from McKee or Moore; the letter to Brown was returned from the Washington postoffice. Prof. Zahm replied that he did not know of Mattullath's having any patent on flying machines, and so far as he knew there was nothing of value left by him. Affiant did not know of the Detroit attorneys, had never heard of or from them, and hence could not apply to them. She further said that she knew nothing of patent procedure, and supposed that matters in the Office were inviolably secret; and did not know that she could have access to the records. Nor did she have any information that suggested any inquiry, or any means to employ anyone to make inquiries; and that she had no idea that a patent application was pending. A supporting affidavit by petitioner's son-in-law corroborated her affidavit respecting the letters, and the want of knowledge, etc. An affidavit by Kaufman Simon supported petitioner's statement as regards his advice, and the letters that were written. The Commissioner denied the petition July 13, 1911. After reciting the proceedings in the Office preceding the entry of abandonment, the Commissioner said:

"No other action was taken by or on behalf of the applicant until November, 1910, over seven years after the period allowed by law for such action had expired, when the original petition to revive was filed. In the meantime dynamic flight, the agelong dream of man, had become an accomplished fact. Others had succeeded in actually flying in heavier-than-air machines, had obtained patents on their inventions, and were reaping the just rewards of their efforts. But for this fact the present application would doubtless have remained neglected for all time, since it appears that the present petitioner, Meta Mattullath, the administratrix of the applicant, learned of it only through parties who sought to use it in connection with the de-

fense of a suit brought by Wilbur and Orville Wright on their Patent No. 821,393.

Under these circumstances, it might well be held that the presumption is conclusive against the existence of acceptable excuse for such delay as occurred in this instance; certain it is that an application so long dead can be revived, if at all, under the provisions of sec. 4894 of the Revised Statutes, only upon a showing of most unusual and compelling circumstances, rendering it impossible to have earlier prosecuted the case. To hold otherwise would be to encourage those who had slept upon their rights while others struggled on to success, to now enter the field and wrest from them the fruits of their labor."

In this statement he treats the last action in the Office as having been taken October 2, 1902, instead of October 1, 1903, which made the delay seven years instead of six.

From this decision the appeal has been prosecuted.

*Mr. W. Hastings Swenarton, Mr. Joseph F. O'Brien,* and *Mr. T. D. Merwin* for the appellant.

*Mr. Webster S. Ruckman* for the Commissioner of Patents.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The right to appeal from a final decision of the Commissioner of Patents is determinable by its substance and effect, rather than its form. *Moore v. Heany,* 34 App. D. C. 31–39; *Re Selden,* 36 App. D. C. 428–431. The appeal in *Selden's Case* was from a decision holding that the application had been abandoned for lack of prosecution within two years. The right to appeal was maintained. Discussing the point, Mr. Justice Robb, delivered the opinion of the court, said: "The question, is whether the striking down of an application on the ground of abandonment amounts to a rejection of the claims thereof, within the meaning of the statute. Of course, if such action on the part of the Commissioner is in effect a rejection of the claims

of the application, the court will look to such result rather than to the manner in which it is reached. Substance should never be sacrificed to form." In that case, as in this, the lapse of time rendered the order tantamount to a complete rejection of the claims, as a new, original application would be practically unavailing.

2. Sec. 4894, Rev. Stat., U. S. Comp. Stat. 1901, p. 3384, governs the abandonment and renewal of applications for patents. It requires that all applications for patents shall be completed and prepared for examination within one year after filing, and in default thereof, or upon failure to prosecute the same within one year after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Commissioner of Patents, that such delay was unavoidable.

It is contended on behalf of the Commissioner that the question of unavoidable delay is one for the exclusive determination of the Commissioner, and his decision is conclusive. The decisions relied on were made in infringement suits where the Commissioner's decision that delay was unavoidable was the subject of collateral attack. On direct appeal from his decision denying renewal, and therefore substantially rejecting the application, the situation is very different. While, ordinarily, the exercise of discretion in matters arising in the course of the litigation will not be disturbed unless it has been abused, nevertheless it is subject to review along with other rulings affecting the rights of the parties, and will be disturbed where the error in its exercise is plainly shown, and works material hardship and injustice. *Kinsman* v. *Strohm*, 31 App. D. C. 581–585. In that case, it is true, the exercise of discretion in reviewing an application was not disturbed, for the reasons given, but the opinion recognizes the power to do so upon sufficient grounds. Sec. 4894, Rev. Stat. does not, in terms, limit this power of review as was the case in some decisions cited. But it is not necessary to discuss this particular question further. In view of the opinion expressed in *Selden's Case,* (36 App. D. C. p.

435), it is admitted by counsel for the Commissioner, that where the question of abandonment is one of law, and not of fact, the action of the Commissioner is not conclusive. In this case the facts are specifically presented in the supporting affidavits. They are clear in their application to every point, and have not been denied. They are, in fact, substantially admitted to be true in both of the decisions heretofore quoted. It appears from the record of proceedings in the Office that the objections to the claims of the application were formal and might, it is reasonable to believe, have been met by amendment. The substantial ground of rejection was inoperativeness, because it was then seriously doubted, if not generally denied, that aerial flight could be accomplished in heavier-than-air machines. During the time that has elapsed since that objection was made, the doubt has been removed. As said by the Commissioner: "In the meantime dynamic flight, the age-long dream of man, had become an accomplished fact. Others had succeeded in actually flying in heavier-than-air machines, had obtained patents on their inventions, and were reaping the just rewards of their efforts." In view of this statement it is not probable that the objection to operativeness, on the ground urged, would now be permitted to stand. The date of the application, and the description therein, demonstrate that the deceased Mattullath was, if not the first, one of the very first, to devise means to accomplish the realization of this "age-long dream." That others have, in the meantime, entered the field, obtained patents, and are reaping the rewards of their efforts, is no bar to this earlier application, unless the delay in reviving the application was avoidable. The Commissioner was in error, we think, in saying that the presumption is conclusive against the existence of acceptable excuse for delay, under the circumstances, on the ground that "to hold otherwise would be to encourage those who had slept upon their rights, while others struggled on to success, to now enter the field and wrest from them the fruits of their labors." The purpose and policy of the patent law are to give the patent to the first inventor, unless he has, by his own fault, subordinated his right to a more diligent inventor. The

question upon which the right of renewal depended was whether the representatives of Mattullath had "slept upon their rights." The delay in reviving the application would, in reasonable probability, not have occurred but for the strange action of the Office in acting upon some unexplained source of knowledge of the death of the applicant, and holding that the death absolutely and at once revoked the power of attorney of his solicitors. The amendments proposed by them, presumably without knowledge of their client's death, were formal; they contained no amplification of the original application and required no additional oath. That the power to make such an amendment had not been revoked by death, and that action could have been taken upon it lawfully, had been declared by the Supreme Court in a decision rendered in January, 1893, *De La Vergne Refrigerating Mach. Co.* v. *Featherstone,* 147 U. S. 209–229, 37 L. ed. 138–145, 13 Sup. Ct. Rep. 283. This decision ought to have been well known in the Office. Strange to say, that, notwithstanding this determination of the revocation of the authority of the solicitors duly entered of record, the order of the former Washington representative of the original solicitors, dated August 14, 1909, to permit a person having no relation to the interested parties, to inspect the application and drawings, was accepted, filed, and, presumably, acted upon.

Why the solicitor should have undertaken to exercise an authority which he knew had been declared revoked, or why, in view of the former order of revocation, he should have been permitted to exercise it, are facts that are unexplained, and seem inexplicable on any reasonable ground. Instead of declaring the authority of the solicitors revoked, and refusing to recognize them for any purpose, it would have been eminently proper to notify them of the death of their client, and suggest the propriety of obtaining a renewal from his legal representatives, meanwhile suspending action for a reasonable time for the purpose. Had this been done, the solicitors would have been under obligation to inquire for, and notify the intestate's representatives of the situation. They have attempted in the letter of November 20, 1909, to relieve themselves of the moral obligation

to give notice by saying that they did not know the address of their client's family. It is contended that notice to the solicitors was the equivalent of notice to the representatives; and that their negligence is to be imputed to petitioner. We do not agree with this. Their negligence in conducting the proceedings, while the relation of client and attorney continued to be recognized in the office, could be imputed to the applicant. But it is unreasonable to argue that their neglect was the neglect of the petitioner, when the Office had declared their authority ended. Moreover, they were never the attorneys of the deceased applicant's representatives. Notwithstanding this express revocation, no attempt was made by the Office to notify the widow, which it is said by the Commissioner it was under no obligation to do, even if aware of her name and address. Rule 20 is the only Office rule regarding notice in case of the revocation of a power of attorney, and this the Commissioner held did not require notice to the applicant. The rule, construed literally, does not seem to require notice to the applicant's representatives, but such construction is within its spirit. At any rate, the widow and children of the deceased applicant had no notice, and it clearly appears that they had no knowledge of the pending application, and were in possession of no facts or circumstances sufficient to put them upon inquiry.

Mattullath left no property whatsoever, and his widow, a woman of sixty-two years of age, was dependent upon one of her children. The family was without means. Seeking the advice of a friendly attorney,—not a patent solicitor,—the widow was advised to write to such persons as might be aware of her husband's interests. This was promptly done. The only reply received was from Washington, and gave no information; nor did the writer suggest inquiry at the Patent Office. That he was interested in the subject-matter, and doubtless knew that inquiry at the Office might obtain certain knowledge, appears from the fact that he is the same person who, in 1909, obtained the permit to examine the Office files in this case. The attorney, upon whose advice the letter of inquiry had been addressed, evidently did not know that information might be had at the

Patent Office. That she was then acting with diligence and in good faith cannot be denied. All sources of information seeming fully exhausted, she remained quiet until stirred into renewed activity by the information of the representative of some other patentee of a flying machine who was engaged in an infringement suit. Probably his information had been obtained through access obtained to the application file, for it was that person who informed the party of the fact. However that may be, she began in good faith to ascertain her rights. Unable to pay attorneys' fees, she procured the services of a charitable attorney, who exacted no charge, and managed to raise the sum of $41 to pay the actual cost of correspondence, copies, etc. The lingering illness of this charitable attorney prevented his filing the petition for renewal. With reasonable diligence she procured the services of another attorney, who proceeded with diligence to file the petition and prosecute the same. It is argued that there was utter failure in the exercise of diligence in that petitioner failed to make inquiry at the Patent Office, because it is a matter of law, with knowledge of which she must be charged. It is said in the printed argument: "It is academic that ignorance of the law excuses no one." Without pausing to consider the many exceptions to the rule that ignorance or mistake of law excuses no one, it is sufficient to say that there is no just foundation for the application of the general rule in this case. There is no statutory or other rule of law requiring parties to apply for information at the Office. It is a fact that information concerning applications for patents will be furnished to the applicant or his legal representatives or assigns. It is not at all wonderful that a woman like the petitioner should have been ignorant of this fact, especially as it seems not to have been known to the lawyer who advised her where to seek information. Nor is it at all remarkable that she should not have known, in making her inquiries, that there was an essential difference between an application and a patent. It plainly appears from her sworn statements that she did not know this difference, or that she could obtain information of

the application by applying to the Office. It was ignorance of a fact, not of law.

3. The next question is upon the intention of Congress in enacting sec. 4894, and the meaning to be given to the word "unavoidable" therein.

In the argument on behalf of the Commissioner it is said: "The decisions of the various Commissioners of Patents, upon the meaning to be attached to the words "unavoidable delay" in the statute, have not been always uniform or altogether consistent." As an instance of the extreme view of strict construction, he cites the decision of Commissioner Butterworth in *Ex parte Klenha,* 28 Off. Gaz. 1272; C. D. 39. He declares it a statute of limitation, to be enforced with all the rigidity of the old statute of limitations at common law. This construction would render it practically impossible to show any delay that would be unavoidable. On the other hand, Commissioner Hall has given the statute a liberal construction. We quote from his opinion in *Ex parte Pratt* (39 Off. Gaz. 1549; 1887 C. D. 31):

"The word 'unavoidable' as used in sec. 4894, Revised Statutes, U. S. Comp. Stat. 1901, p. 3384, is one of very broad significance. In its application to many relations it would exclude everything but the 'King's enemies' or an act of God. I do not believe such a construction would be a fair interpretation of the statute. The statute is one regulating a mere practice in the Office, and is not intended to affect substantial rights as between different persons or between persons and the government. It is rather a provision by which a statutory limitation may be removed. Its purpose is to encourage diligence in proceedings before the Office. If the broad and unlimited meaning of the word 'unavoidable' were to prevail, it is difficult to conceive when an abandoned case could be reinstated under this section. In my opinion, the word is used in a more limited sense. It is applicable to ordinary human affairs, and requires no more or greater care or diligence than is generally used and observed by prudent and careful men in relation to their most important business. It permits them, in the exercise of this

care, to rely upon the ordinary and trustworthy agencies of mail and telegraph, worthy and reliable employees, and such other means and instrumentalities as are usually employed in such important business. If unexpectedly, or through the unforeseen fault or imperfection of these agencies and instrumentalities, there occurs a failure, it may properly be said to be unavoidable, all the other conditions of good faith and promptness in its ratification being present."

The Commissioner seems to have leaned toward the strictness of the construction first mentioned. We approve, in general, the doctrine expressed by Commissioner Hall. The first construction is technical, hard, and narrow. The second is broad and liberal, breathing the spirit of equity, and more in accord with the general policy of our patent laws. See *Smith* v. *Goodyear Dental Vulcanite Co.* 93 U. S. 486–491, 23 L. ed. 952, 953. Tested by the standard of diligence above declared, we are of the opinion that the delay in this case has been shown to be unavoidable in the proper sense of the statute. The petitioner has not "slept upon her rights," and is entitled to the relief which she seeks. Its denial would work a great hardship, unjustified by her conduct, upon the penniless widow of a deceased inventor of merit, who died almost at the point of success, leaving the invention as his only property.

The decision will be reversed. As heretofore suggested, it is improbable that the objection to operativeness will now be insisted upon; but there may be particulars in which the interests of both public and the inventor may be conserved by reasonable amendment. As in the *Case of Selden,* 36 App. D. C. 435, the reversal will be with direction to set aside the order of abandonment, and reinstate the application. It is so ordered, and the clerk will certify this decision to the Commissioner of Patents.

*Reversed.*